**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

JULIO SALAZAR ESTRADA,
           *Petitioner-Appellant,*

v.

A.K. SCRIBNER, Warden,
           *Respondent-Appellee.*

No. 06-55013

D.C. No.
CV-03-02571-BTM

OPINION

Appeal from the United States District Court
for the Southern District of California
Barry Ted Moskowitz, District Judge, Presiding

Argued and Submitted
August 7, 2007—Pasadena, California

Filed January 23, 2008

Before: Alex Kozinski, Chief Judge, Johnnie B. Rawlinson,
Circuit Judge, and Harold Baer, Jr.,* Senior District Judge.

Opinion by Judge Baer

*The Honorable Harold Baer, Jr., Senior United States District Judge for the Southern District of New York, sitting by designation.

1037

## COUNSEL

Kurt David Hermansen, Law Office of Kurt David Hermansen, San Diego, California, for the petitioner-appellant.

Bill Lockyer, Mary Jo Graves, Gary Schons, Matthew Mulford, Elizabeth Hartwig, Office of Attorney General of the State of California, San Diego, California, for the respondent-appellee.

## OPINION

BAER, Senior District Judge:

Petitioner-Appellant Julio Salazar Estrada ("Petitioner" or "Estrada") appeals the district court's denial of his 28 U.S.C. § 2254 *habeas* petition for a new trial after his conviction in California state court for second-degree murder, *see* Cal. Pen. Code § 187, as well as taking a vehicle without the owner's consent, *see* Cal. Veh. Code § 10851(A). Estrada claims that his rights to due process and a fair and impartial jury under

the Sixth and Fourteenth Amendments were violated because juror misconduct resulted in the consideration of impermissible extraneous information by the jury, and because two jurors were impermissibly biased.[1]

We affirm the district court's denial of Estrada's petition.

## I.  BACKGROUND

### A.  *Underlying Facts of Crime*

On July 16, 1997, Dennis Morgan was found stabbed to death in the driveway of his parents' home in El Centro, CA. Petitioner Julio Estrada testified that he was hitchhiking in Calexico when Morgan offered him a ride in his car. According to Estrada, Morgan offered that if Estrada would return to Morgan's house that night, Morgan would help Estrada get a bus ticket to San Bernardino the next day. Estrada went to Morgan's house, where Morgan sought to have sex with Estrada.

According to Estrada, he attempted to leave, but Morgan blocked the door. Estrada grabbed a knife from the kitchen. Morgan blocked his path and tried to grab the knife away. Estrada swung at Morgan and then, according to Estrada, Morgan "impaled himself" on the knife. Estrada left the apartment, drove away in Morgan's car and was later stopped by

---

[1]Estrada also seeks to brief three issues that the district court considered and rejected without issuing a certificate of appealability — namely, that 1) Estrada was deprived of a constitutional jury selection procedure, 2) the trial court erroneously allowed evidence of Estrada's prior robbery conviction, and 3) the trial court erroneously excluded evidence of the decedent's past conduct. Estrada subsequently raised these uncertified issues in his opening brief and thus, pursuant to 9th Cir. R. 22-1(e), brought a motion to expand the district court's certificate of appealability.

We decline to expand the district court's certificate of appealability to include these three issues, nor do we request a response from Respondent pursuant to 9th Cir. R. 22-1(f).

Border Patrol agents. Morgan's autopsy showed that he bled to death.

## B.  Trial

On October 28, 1997, the district attorney filed an amended complaint charging Estrada with murder, *see* Cal. Pen. Code § 187; taking a vehicle without the owner's consent, *see* Cal. Veh. Code § 10851(A); and receiving stolen property, *see* Cal. Pen. Code § 496(A). After a trial by jury, Estrada was convicted of murder in the second degree and of taking a vehicle without the owner's consent. The jury acquitted Estrada of first degree felony murder and receiving stolen property. On October 24, 2000, the trial court sentenced Estrada to 19 years to life in prison.

## C.  Alleged Juror Misconduct and Bias

After the verdict, Estrada moved for a new trial and submitted several declarations by various jurors to support his claims of misconduct. Juror No. 1 stated that other jurors summarily dismissed his arguments for manslaughter, told him that he lacked understanding of the case, told him that a mistrial was not an option, and pressured him into voting for second degree murder although he did not believe Estrada was guilty of that crime. Juror No. 1 also stated that he was on probation and was afraid that if he were the cause of a mistrial, it might affect his probation status.[2] Finally, Juror No. 1 reported that

---

[2]Juror No. 1 reiterated this belief twice in his handwritten declaration, saying at one point, "I did not want to do something wrong and be the only one holding out. So, I change[d] my verdict. I felt that if I allowed a mistrial I was doing something wrong. I am currently on probation and I felt that it might affect my probation," and at another, "I felt pressured to change my vote and further felt that if I did not do this, that I would be doing something wrong that could have caused problems with my probation."

The entirety of the record below is inconclusive as to whether Juror No. 1 was, in actuality, a probationer.

during deliberations, jurors discussed imposing a lengthy sentence on Estrada to prevent him from committing another crime.[3]

Juror No. 7 stated in her declaration that she did not have enough time to study the jury instructions, and that although she, too, believed Estrada should have been found guilty of manslaughter, she felt pressured to vote for second degree murder in order to prevent a mistrial and Estrada's early

---

[3]Juror No. 1 related the following regarding the timing of these discussions regarding the need for a lengthy sentence:

> "When we first started our deliberations, there was a vote taken and it was eleven for guilty in the second degree and myself guilty for manslaughter. This vote was taken approximately 3:00 or 4:00 P.M. on Friday, August 4th. . . .

> On Monday, August 7th, the discussion pertained to first degree, second degree, and also about the timing of robbery. Ten (10) jurors change [sic] their vote to first degree[,] one remain[e]d at 2nd degree[,] and I change [sic] my vote to 2nd degree.

> There were discussions that if Mr. Estrada was not given a long sentence, he would get out soon and do this again, referring to the murder. . . .

> On several occasion [sic] I raised the issue of manslaughter and that the killing was the result of a fight and that Mr. Estrada did not have the intent to kill Mr. Morgan. Again, I was put off and told that they were discussing first degree and that also I did not understand or heard things wrong.

> On Tuesday, August 8th . . . I discussed that there had been no intent . . . and that there may have to be a mistrial. The foreman and other jurors told me there could not be a mistrial because it would take more time.

> On the same day . . . we submitted to the Judge a request concerning some clarification as to the timing of the robbery in relation to the homicide. The Judge clarified this timing, if the robbery occurred after the mortal wound then it could not be a felony murder . . . .

> It was then proposed that the people who wanted first degree would agree to second degree and that I would give second degree instead of manslaughter and then a verdict of second degree could be given to avoid a mistrial."

release from custody.[4] Juror No. 7 also claimed that Juror No. 8 was obviously influenced to find Estrada guilty of murder because he knew a parolee who was released from prison and thereafter killed someone with a hammer.[5] Juror No. 7 declared that Juror No. 8 said that if Estrada were not given a lengthy sentence, he would repeat his offense.

In a supplemental declaration, Juror No. 7 also revealed that contrary to the court's orders, Juror No. 8 engaged in dis-

---

[4]"I also feel Mr. Estrada should have been convicted of Voluntary Manslaughter because there was no proof that Mr. Estrada intended to murder Mr. Morgan. . . .

> I tried to read the jury instructions, but I felt pressured from the other members of the jury to hurry up and cast a vote. I wanted to spend more time working on trying to understand better the intent issue and how it had to be proven or unproven and just how exactly it related to the particular facts [of] this case.

> Because of the pressure of getting this matter over with, and further because of the pressure that the other jurors did not want a mistrial, I consented to Second Degree Murder.

> It was discussed by some that if there was a mistrial, that Mr. Estrada would be let free. . . ."

[5]"During the deliberations one juror . . . disclosed that he was in a foster home, and that this foster home allowed prisoners who were released from prison to stay in the home. One of these released prisoner[s] who stayed at this home ended up killing someone with a hammer. Juror [No. 8] felt that Estrada, if not given a long sentence would repeat the same offense. This is the same juror who initiated discussion of a penalty phase which was carried on by other jurors for a period of time. Some jurors did object to discussion of the penalty phase, but a number of them did participate in it.

> Juror [No. 8] became quite emotional about this incident of the hammer slaying. His demeanor was such that you could see that this incident of a person getting out of prison and then killing somebody was very fresh in his mind and very vivid in the way he expressed it, even though it occurred many years ago. It was also very clear that this incident that occurred in his prior life significantly influenced his decision on this case . . . ."

Juror No. 7 referred to Juror No. 8 as "Juror K" in her declaration.

cussions about the case with other jurors before the matter was formally submitted to the jury.

Estrada's counsel prepared a declaration for Juror No. 12 that she ultimately never signed. The declaration attributed to Juror No. 12 states that Juror No. 8 was unduly influenced by the murder of his own mother, and that Juror No. 8 wanted Estrada to be imprisoned for a lengthy term.[6] According to the declaration submitted by Estrada's defense investigator Robert Weeks, Juror No. 12 refused to sign the prepared declaration, not because the statements therein were incorrect, but because Juror No. 12 feared repercussions from the victim's family if they found out she revealed deliberation irregularities and the verdict was invalidated.

Estrada intended to call Juror No. 12 as a witness at the state court's hearing on his motion for a new trial. Estrada contended that Juror No. 12's testimony would confirm that Juror No. 1 was treated disrespectfully by the other jurors, and that the murder of Juror No. 8's mother unduly influenced Juror No. 8 to vote for murder. Estrada argued that Juror No. 12's testimony would prove that Juror No. 8 was not truthful on voir dire when Juror No. 8 said his mother's murder would not affect his ability to be fair. Estrada further contended that Juror No. 12 was not forthcoming on voir dire about her connection with the Morgan family and how this might impact her ability to be fair.

In response, the prosecutor offered a second declaration from Juror No. 1, this one stating that the pressure he felt was

---

[6]"There was one juror . . . who indicated during the selection of the jurors that his mother had been murdered and that he could put that aside. . . . During the deliberation it was very apparent that Juror [No. 8] could not put his mother's murder aside. In fact, he brought up with vivid emotions what happened to his mother. He did not want Mr. Estrada to be released, and this is when the discussion was brought up of imposing a long term so that Mr. Estrada could do this again. Juror [No. 8] was very adamant . . ."

self-imposed, he was not pressured by other jurors to reject a finding of manslaughter, and he was convinced after further consideration that Estrada was guilty of second degree murder. The prosecutor also submitted her own declaration stating that if Juror No. 8 were called to testify, he would deny that he discussed the case before it was submitted to the jury, that he knew of any parolee who killed someone with a hammer after being released from prison, or that his mother's murder influenced him to find Estrada guilty of second degree murder.

The trial court concluded that all the declarations submitted by the defense and Juror No. 12's proposed testimony constituted inadmissible evidence of the jurors' mental processes in reaching a verdict. The court denied Estrada's request to call Juror No. 12 as a witness and Estrada's motion for a new trial.

### D.   Procedural History

The state appellate court denied Estrada's appeal on October 17, 2002. *See People v. Estrada*, No. D036756, 2002 Cal. App. Unpub. LEXIS 9616 (Cal. Ct. App. Oct. 17, 2002) (unpublished). It held, *inter alia*, that most of the statements in Estrada's proffered declarations and Juror No. 1's belief that his probation status would be affected in the event of a mistrial, were inadmissible evidence of the mental processes used by the jury in reaching their verdict. *See id.* at *12-13, *15-16. The state appellate court did hold that the trial court erred when it failed to admit statements regarding the discussion of sentencing during deliberations, as well as Juror No. 8's discussion of a homicide with a hammer. *See id.* at *16-17. However, it held that there was no "substantial likelihood" that the improper discussions influenced the jury, or that one or more jurors were "actually biased" against Estrada. *Id.* at *18-21. The Supreme Court of California subsequently denied Estrada's petition for review.

Petitioner filed his § 2254 *habeas* petition *pro se* on December 23, 2003. The Magistrate agreed with the reasoning

of the state appellate court regarding the portions of the declarations that could, and could not, be considered, and generally found the state court's reasoning "not unreasonable." The district court, on December 29, 2004, adopted the findings and conclusions of the Magistrate and denied all of Estrada's claims, but granted a certificate of appealability as to Estrada's claims for juror misconduct and juror bias.

On January 12, 2005, Petitioner, while in prison, filed a *pro se* motion in the district court for appointment of counsel at public expense. *See* 28 U.S.C. § 2254(h). Petitioner listed the caption of the case and stated that the district court denied his petition for *habeas corpus* on December 29, 2004, but issued a certificate of appealability as to Claim 1. Petitioner stated further that "petitioner . . . is a Mexican National whose reading skills in English are very limited," and noted that because of the imminent transfer of his "next friend" legal aide in prison, "petitioner would be left to proceed alone from hereon." Petitioner prayed that the Court "appoint counsel, and any other actions this Court finds necessary or appropriate." Petitioner filed a formal notice of appeal on December 18, 2005. Appellate counsel was appointed on June 1, 2006.

## II. STANDARDS OF REVIEW

This Court reviews *de novo* a district court's denial of a petition for *habeas corpus*. *See Hasan v. Galaza*, 254 F.3d 1150, 1153 (9th Cir. 2001). The state court's factual findings are entitled to a presumption of correctness unless the petitioner rebuts the presumption with clear and convincing evidence. *See Solis v. Garcia*, 219 F.3d 922, 926 (9th Cir. 2000) (citing, e.g., 28 U.S.C. § 2254(e)(1)). Findings of fact by the district court are reviewed for clear error. *Mancuso v. Olivarez*, 292 F.3d 939, 948-49 (9th Cir. 2002).

Petitioner will prevail in appealing the district court's denial of *habeas* if the state court's decision upholding his conviction either 1) "resulted in a decision that was contrary

to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or 2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d)(1), (d)(2).

On collateral review, trial errors — such as extraneous information that was considered by the jury — are generally subject to a "harmless error" analysis, namely, whether the error had "substantial and injurious" effect or influence in determining the jury's verdict. *Jeffries v. Wood*, 114 F.3d 1484, 1491 (9th Cir. 1997) (citing *Brecht v. Abrahamson,* 507 U.S. 619, 638 (1993)); *see also Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). However, the presence of a biased juror is a structural error, not subject to the harmless error analysis, and if one is found the defendant is entitled to a new trial. *See*, *e.g.*, *Dyer v. Calderon*, 151 F.3d 970, 973 n.2 (9th Cir. 1998) (en banc).

The decision by a district court to grant or deny an evidentiary hearing is reviewed for abuse of discretion. *See*, *e.g.*, *United States v. Saya*, 247 F.3d 929, 935 (9th Cir. 2001); *see also Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007). On collateral review of a state court conviction, "a federal court must consider whether such a[n] [evidentiary] hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 127 S. Ct. at 1940. Additionally, in considering whether the applicant would be entitled to federal habeas relief, a federal court must take into account the deferential standards of 28 U.S.C. § 2254. *See id.*[7]

---

[7]It should be noted that 28 U.S.C. § 2254 (e)(2) generally prohibits federal habeas courts from granting evidentiary hearings when applicants have failed to develop the factual bases for their claims in state courts. That provision, however, is not applicable here, as petitioner properly sought, and was denied, an evidentiary hearing in both state and federal court. *See, e.g., Earp v. Ornoski*, 431 F.3d 1158, 1169 (9th Cir. 2005).

## III. DISCUSSION

### A. Adequacy of Notice of Appeal

[1] A notice of appeal must be filed in the district court within 30 days of judgment.[8] Fed. R. App. P. 4(a). Here, the *pro se* prisoner Petitioner did not timely file a notice of appeal, but did timely file, within the prescribed 30 days, a motion for appointment of appellate counsel. The salient question is whether Petitioner's motion for appellate counsel satisfies the requirements for a notice of appeal set forth by Fed. R. App. P. 3(c).

Rule 3(c) requires a notice of appeal to specify (1) the party taking the appeal, (2) the order from which the appeal is taken, and (3) the court to which the appeal is taken. The purpose of Rule 3(c) is to ensure that the opposing party is given notice of the petitioning party's intent to appeal. *Buffalo v. Sunn*, 854 F.2d 1158, 1161 (9th Cir. 1988). Rule 3(c)(4) further states that "[a]n appeal must not be dismissed for informality of form or title of the notice of appeal, or for failure to name a party whose intent to appeal is otherwise clear from the notice." *See also Smith v. Barry*, 502 U.S. 244, 248-49 (1992) ("If a document filed within the time specified by Rule 4 gives the notice required by Rule 3, it is effective as a notice of appeal."). Additionally, we construe Estrada's motion liberally, as he is *pro se*. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976); *Biwot v. Gonzales*, 403 F.3d 1094, 1097-98 (9th Cir. 2005) (citing *Barron v. Ashcroft*, 358 F.3d 674, 676 n.4 (9th Cir. 2004)).

[2] Here, Estrada's motion identified the party seeking to take the appeal (i.e. himself), referenced the judgment which

---

[8]"In a civil case, except as provided in Rules 4(a)(1)(B), 4(a)(4), and 4(c), the notice of appeal required by Rule 3 must be filed with the district clerk within 30 days after the judgment or order appealed from is entered." Fed. R. App. P. 4(a).

he sought to appeal and the district court's issuance of a certificate of appealability, and sought appellate counsel. Such averments, particularly considering Petitioner's *pro se* status, are sufficient to put the government on notice of petitioner's intent to appeal. *See United States v. Ward*, 696 F.2d 1315, 1317 (11th Cir. 1983) (*pro se* petitioner's letter expressing an intent to appeal and requesting appointment of an attorney satisfies Fed. R. App. P. 3(c)). Further, Petitioner's failure to specify the "Ninth Circuit Court of Appeals" in his motion does not bar his appeal here. *See Grune v. Coughlin*, 913 F.2d 41, 43 (2d Cir. 1990) ("[T]he mere failure to identify that the appeal would be taken to this Court does not nullify the notice when it is clear that this is the Court to which the appeal would be directed"). We accordingly have jurisdiction to hear Estrada's appeal.[9]

## B. *Admissibility of Evidence*

**[3]** As a threshold matter, we must consider whether the district court was correct when it determined that, like the state court, it could not consider certain portions of the jurors' affidavits proffered by Estrada. *See Sassounian*, 230 F.3d at 1108.

Federal Rule of Evidence 606(b) provides that:

> "[A] juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or

---

[9]Because Petitioner's motion for appellate counsel was filed within 30 days, and the issues here concern the *form* of Petitioner's motion, not the *timing*, Petitioner's appeal is not barred by *Bowles v. Russell*, 127 S. Ct. at 2360, 2363 (2007) (appeal of denial of *habeas* petition that was filed at district court's direction two days after expiration of time limit was barred by "mandatory and jurisdictional" time limits of Fed. R. App. P. 4).

indictment or concerning the juror's mental processes in connection therewith. But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention, [or] (2) whether any outside influence was improperly brought to bear upon any juror. . . . A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying."

Fed. R. Evid. 606(b).

A long line of precedent distinguishes juror testimony about the consideration of extrinsic evidence, which we may consider, from juror testimony about the subjective effect of evidence on any of the particular jurors here, which we may not consider. Although "having to ignore the most direct evidence of prejudice — [i.e., the jurors'] testimony that she relied on the extrinsic information — lends an 'Alice in Wonderland' quality to the discussion . . . the weight of authority and sound policy reasons support this view." *See Sassounian*, 230 F.3d at 1109 (citing *McDonald v. Pless,* 238 U.S. 264, 267-68 (1915) (noting that finality of verdicts supports the rule)).

**[4]** Regarding the portions of the declarations of Jurors Nos. 1 and 7, and the unsigned affidavit of Juror No. 12, that alleged that Jurors No. 1 and 7 felt pressured to vote for second-degree murder and were treated disrespectfully by other jurors, the state courts correctly concluded that such evidence was inadmissible as the subjective "mental processes" of Jurors No. 1 and 7.[10] The district court adopted that view

---

[10]Cal. Evid. Code § 1150(a) is substantively similar to Fed. R. Evid. 606(b). Cal. Evid. Code § 1150(a) provides that: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely

as well. Such a ruling is consonant with Fed. R. Evid. 606(b), and thus not contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Tanner v. United States*, 483 U.S. 107, 120-22 (1987).

**[5]** Regarding the portion of Juror No. 1's declaration that set forth his mistaken belief that his probation status would be adversely affected by a mistrial, the state courts similarly concluded that these statements were inadmissible evidence of Juror No. 1's "subjective reasoning process," rather than extrinsic evidence of extraneous information injected into deliberations.[11] The district court agreed. Indeed, there is no indication from any of the affidavits that Juror No. 1 articulated this belief to the jury and thus injected it into the deliberations. The district court's ruling is consonant with Fed. R. Evid. 606(b), and thus not contrary to, or an unreasonable application of, clearly established Supreme Court law.

**[6]** Regarding the portions of the affidavits detailing the improper discussions of sentencing, as well as Juror No. 8's introduction of a prior murder into the discussions to support a longer sentence, the state appellate court determined that those portions were admissible. The district court agreed, as such evidence was "extrinsic evidence." That determination was correct, and we may consider such evidence in reviewing Estrada's claims. Additionally, we may consider the portions of the declarations discussing Juror No. 8's introduction of his

---

to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." *See generally In re Hamilton*, 20 Cal. 4th 273, 294 (1999).

[11]The portions of the affidavits relating evidence of the jurors' compromise, as well as the belief that Estrada might be released in the event of a mistrial, were similarly excluded by the trial court, with that determination upheld by the state appellate court and district court. Those portions are similarly barred by Fed. R. Evid. 606(b).

mother's murder into sentencing discussions. The district court and state courts erred in finding this inadmissible, because Juror No. 8's mother's murder accordingly became "extrinsic evidence" considered by the jury, and evidence of the murder is admissible. *Cf. Jefferies*, 114 F.3d at 1491 (focus is on the nature of information, rather than whether the source of information was from another juror or from outside sources) (citing, e.g., *Turner v. Louisiana*, 379 U.S. 466, 472-73 (1965)). The state court's decision was therefore "contrary to" established Supreme Court precedent on this point.

### C. Introduction of Extraneous Information Into Sentencing Discussions

The Sixth Amendment guarantee of a trial by jury requires the jury verdict to be based on the evidence produced at trial. *Jeffries*, 114 F.3d at 1490 (citing *Turner v. Louisiana,* 379 U.S. 466, 472-73 (1965)). "A juror's communication of extrinsic facts implicates the Confrontation Clause." *Sassounian*, 230 F.3d at 1108 (citing *Jeffries*, 114 F.3d at 1490). "The juror in effect becomes an unsworn witness, not subject to confrontation or cross examination." *Id.* (citing *Jeffries*, 114 F.3d at 1490). That the unsworn testimony comes from a juror does not diminish the scope of a defendant's rights under the Sixth Amendment. *Jeffries*, 114 F.3d at 1490 (citing *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995)).

Juror misconduct is subject to "harmless error" analysis. *Sassounian*, 230 F.3d at 1108. We look to the following factors to determine whether a defendant has suffered prejudice from juror misconduct:

> (1) whether the material was actually received, and if so, how;
>
> (2) the length of time it was available to the jury;
>
> (3) the extent to which the juror discussed and considered it;

(4) whether the material was introduced before a verdict was reached, and if so at what point in the deliberations; and

(5) any other matters which may bear on the issue of the reasonable possibility of whether the extrinsic material affected the verdict.

*Id.* at 1109.

**[7]** The state appellate court held that the jurors' discussion of sentencing, as well as the discussion of an unrelated murder within that context, was improper jury misconduct. Still, the state appellate court found that there was no "substantial likelihood" that the improper discussion of sentencing influenced the jury. Foremost in its analysis was its finding that these facts occurred in this sequence: 1) a vote of 11 jurors for second-degree murder and one for manslaughter; 2) a vote of 10 jurors for first degree murder, and two for second degree murder; 3) the discussion of the extraneous information regarding the need for a longer sentence; and 4) the jury's ultimate verdict of second-degree murder. As the jury ultimately found the lesser charge of second degree murder, the state appellate court reasoned that the extraneous information did not result in a longer sentence for defendant (as indeed, the jury found Estrada guilty on a lesser charge *after* the improper discussions).

**[8]** The state appellate court therefore found that the improper sentencing discussion happened *after* — rather than *before* — the change of votes to first degree murder simply because in Juror No. 1's declaration describing the events of Monday, August 7th, his statement that "there were discussions" about sentencing occurs in the next sentence after his statement that jurors changed their votes. An equally plausible scenario is that Juror No. 1's statement about the sentencing discussions was simply intended to provide the reasons for the change, rather than the relation of a temporally distinct event.

Under this scenario, one could reasonably infer that 1) the jury engaged in improper sentencing discussions about the need for a longer sentence, 2) the majority of jurors subsequently changed their votes from second-degree to first-degree murder, and then, 3) the majority compromised with the holdouts by voting for second degree murder (despite the fact that the holdouts felt that intent was not present). Were those facts to be true, there may well be a "substantial likelihood" that the improper discussions influenced the jury.

**[9]** State appellate court findings, however, are normally entitled to a presumption of correctness. *See Dyer*, 151 F.3d at 979 n.11. It cannot be said that the state court's finding of the timing of these events was an "unreasonable" determination of the facts. 28 U.S.C. § 2254(d)(2).

**[10]** Even if Estrada's version of events were true, Estrada's claim would fail because the state appellate court rested its decision to deny Estrada's petition on alternate grounds — most prominently, that the jury voted for second degree murder shortly after a colloquy between the trial judge and jury in which the judge charged that if the robbery followed the murder, Estrada would not properly be subject to first-degree murder liability under a felony-murder theory.[12] The timing of this colloquy, and the short amount of time between the colloquy and the verdict, supports the argument that the jury reached its verdict for reasons unrelated to the improper sentencing discussions. *Cf. Sassounian*, 230 F.3d at 1110-12 (calling "critical" the fact that the jury discussed improper evidence shortly before rendering a verdict). Even if Estrada was granted an evidentiary hearing, and if the additional evidence showed that the improper discussion preceded the vote for first degree murder, the state court's determination that the improper discussion did not prejudice the jury was not "con-

---

[12]Additionally, as the district court noted, there was no indication that the improper discussion of sentencing was lengthy, and some jurors pointed out that the discussion was improper and objected.

trary to" or an "unreasonable application of" Supreme Court precedent in light of the other evidence rebutting a presumption of prejudice. It follows that the district court did not abuse its discretion when it declined to hold an evidentiary hearing. "[I]f the record refutes the applicant's factual allegations or otherwise precludes habeas relief, a district court is not required to hold an evidentiary hearing." *Schriro v. Landrigan*, 127 S. Ct. at 1940; *see also United States v. Langford*, 802 F.2d 1176, 1180 (9th Cir. 1986).

### D.  Juror Bias

"The Sixth Amendment guarantees criminal defendants a verdict by impartial, indifferent jurors. The bias . . . of even a single juror would violate [Defendant's] right to a fair trial." *Dyer*, 151 F.3d at 973 (citation omitted); *see also McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554 (1984); *Smith v. Phillips*, 455 U.S. 209, 217 (1982). We have analyzed juror bias under two theories — actual bias and implied bias. *See Fields v. Woodford*, 309 F.3d 1095, 1103 (9th Cir. 2002).

Actual bias is, in essence, " 'bias in fact' — the existence of a state of mind that leads to an inference that the person will not act with entire impartiality." *United States v. Gonzalez*, 214 F.3d 1109, 1112 (9th Cir. 2000) (citations omitted). If a Defendant can show that a juror "failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause," then Defendant is entitled to a new trial. *United States v. Henley*, 238 F.3d 1111, 1121 (9th Cir. 2001). The presence of a biased juror is a structural error not subject to harmless error analysis. *Dyer*, 151 F.3d at 973 n.2. The determination of whether a juror is actually biased is a question of fact, and thus accorded deference under 28 U.S.C. § 2254. *See Fields v. Woodford*, 309 F.3d at 1103.

**[11]** Here, the trial court held a hearing and found that neither Juror No. 12 nor Juror No. 8 was actually biased. The

state courts found that Juror No. 12's discomfort at signing her affidavit after the verdict, because of the thought of facing the victim's family, did not mean that she dishonestly answered questions during voir dire when she disclosed her relationship to the decedent's family and represented that she could judge the evidence fairly. Similarly, the state courts found insufficient evidence that Juror No. 8 intentionally concealed an actual bias during voir dire when he disclosed his mother's murder and represented that he could judge the evidence fairly. We cannot say that either of those factual determinations was "unreasonable."

Additionally, in "extraordinary cases, courts may presume bias based on the circumstances." *Dyer*, 151 F.3d at 981 (citations omitted). We have indicated four instructive fact situations where juror bias might be implied. In *Coughlin v. Tailhook Ass'n*, we discussed the following scenarios:

> (1) where the juror is apprised of such prejudicial information about the defendant that the court deems it highly unlikely that he can exercise independent judgment even if the juror states he will, (2) the existence of certain relationships between the juror and the defendant, (3) where a juror or his close relatives have been personally involved in a situation involving a similar fact pattern, and (4) where it is revealed that the juror is an actual employee of the prosecuting agency, that the juror is a close relative of one of the participants in the trial or that the juror was a witness or somehow involved in the underlying transaction.

112 F.3d 1052, 1062 (9th Cir. 1997).

Two of the four situations could apply here. One is the existence of certain relationships between the juror and the defendant, as applied to Juror No. 12. The second is where a juror or a close relative has been personally involved in a situ-

ation involving a similar fact pattern, as applied to Juror No. 8. *Compare Tinsley v. Borg*, 895 F.2d 520, 529 (9th Cir. 1990) (declining to find implied bias in rape trial where a juror had counseled rape victims because neither the juror nor a close relative had been a rape victim), *with United States v. Eubanks*, 591 F.2d 513, 516-17 (9th Cir. 1979) (finding implied bias in heroin conspiracy trial where juror's sons were serving prison terms for heroin-related crimes). Implied bias presents a mixed question of law and fact which is reviewable *de novo. Dyer*, 151 F.3d at 979.

Still, even considering the theory of implied bias, Estrada's claims are unavailing. We cannot say that Juror No. 12's relationship to the Morgan family put her in an "extreme" situation, as she was not related to any members of the victim's immediate family. The state appellate court's determination that Juror No. 12 was not impliedly biased was therefore not "contrary to" or an "unreasonable application" of Supreme Court law.[13] *See Smith*, 455 U.S. at 222-23 (O'Connor, J., concurring). Regarding Juror No. 8, even considering that he discussed his mother's murder in the deliberations, we cannot say that such evidence would render "unreasonable" or "contrary to law" the determination that Juror No. 8 answered his voir dire questions honestly.[14] In that regard, this case differs from *Dyer v. Calderon*, 151 F.3d at 979-81, in which the juror in question was found to have lied repeatedly to gain a seat on the jury.

---

[13]The Magistrate Judge noted that Juror No. 12 did not appear to be related to any members of the victim's immediate family.

[14]Because Petitioner's claims are unavailing in any event, it is unnecessary to decide, as a general matter, whether evidence of actual or implied bias disclosed during deliberations is admissible despite the prohibition of subjective evidence by Fed. R. Evid. 606(b). *See United States v. Henley*, 238 F.3d at 1121 (finding "persuasive" cases that have exempted evidence of racial prejudice from Fed. R. Evid. 606(b), and finding that evidence of racial bias is admissible where juror was questioned about racial bias during voir dire, and remanding to district court to make findings, but ultimately declining to decide as a general matter whether evidence of racial bias disclosed during deliberations is admissible).

**[12]** Because a hearing was unlikely to change the final result, the state court's determination was not "contrary to" or an "unreasonable" application of Supreme Court law. The district court therefore did not abuse its discretion when it declined to hold a hearing. *Schriro v. Landrigan*, 127 S. Ct. at 1940.

**AFFIRMED**.